IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:12-CV-71-D

| | |
|---|---|
| B. GRANT YARBER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) **ORDER** |
| CAPITAL BANK, CAPITAL BANK | ) |
| CORPORATION, and CAPITAL BANK | ) |
| FINANCIAL CORP., | ) |
| | ) |
| Defendants. | ) |

On February 17, 2012, B. Grant Yarber ("Yarber" or "plaintiff") filed a complaint against

Capital Bank, Capital Bank Corporation (collectively, "Capital Bank") and Capital Bank Financial

Corporation ("CBFC") (collectively, "defendants") alleging violations of the Employee Retirement

Income Security Act of 1974 ("ERISA"), breach of contract, and tortious interference with a contract

in connection with severance pay provisions in Yarber's employment contract. Compl. [D.E. 1].

On April 9, 2012, defendants moved to dismiss under Rule 12(b)(6) of the Federal Rules of Civil

Procedure [D.E. 12] and filed a supporting memorandum and exhibits [D.E. 13]. Yarber responded

in opposition [D.E. 15], and defendants replied [D.E. 16]. As explained below, the court grants

defendants' motion to dismiss.

I.

In analyzing a 12(b)(6) motion, the court determines whether the complaint is legally and

factually sufficient. See Fed. R. Civ. P. 12(b)(6); Ashcroft v. Iqbal, 556 U.S. 662, 677–80 (2009);

Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555–56, 563 (2007); Coleman v. Md. Court of Appeals,

626 F.3d 187, 190 (4th Cir. 2010), aff'd, 132 S. Ct. 1327 (2012); Giarratano v. Johnson, 521 F.3d

298, 302 (4th Cir. 2008). A court need not accept a complaint's "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement." Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc., 591 F.3d 250, 255 (4th Cir. 2009). However, the court "accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff in weighing the legal sufficiency of the complaint." Id. In considering the motion, the court may take judicial notice of matters of public record. Sec'y of State for Def. v. Trimble Navigation Ltd., 484 F.3d 700, 705 (4th Cir. 2007). The court also may consider documents attached to the complaint and documents attached to the motion to dismiss if those documents are integral to the complaint and authentic. Id.

Yarber worked for Capital Bank as the bank's President and Chief Executive Officer. Compl. [D.E. 1] ¶ 22. Yarber and Capital Bank entered into a written employment agreement on May 1, 2004, and amended the agreement on January 25, 2007. Compl. ¶¶ 23, 24. On or about September 17, 2008, Yarber and Capital Bank entered into an Amended and Restated Employment Agreement (the "Employment Contract"). Compl. ¶ 25 & Ex. A ["Employment Contract"]. Under the Employment Contract, Yarber was entitled to a base salary of $350,000, incentive payments, and other benefits. Compl. ¶ 28; Employment Contract. Section 5(c) of the Employment Contract also provided for "change-in-control" severance payments equal to a multiple of Yarber's salary if another corporate entity gained majority control of Capital Bank and Yarber's employment was terminated for any of the reasons specified in the contract. Compl. ¶ 29; Employment Contract § 5(c). Capital Bank or Yarber could terminate his employment at any time, for any reason, with thirty days' notice. Employment Contract § 4(a). Finally, Yarber's contract also specified that "[n]o change or modification of this Agreement shall be valid unless such change or modification is in writing and signed by the parties." Employment Contract § 11.

2

CBFC, formerly known as North American Financial Holdings, Inc., offered to purchase a controlling interest in Capital Bank in 2010. Compl. ¶¶ 14, 30–31. During negotiations, all parties agreed that Yarber would remain the president of Capital Bank after the purchase. Id. ¶ 32.

Before entering negotiations with CBFC, Capital Bank had sold preferred stock to the United States Department of the Treasury ("Treasury Department") under the Troubled Asset Relief Program ("TARP"). Id. ¶ 33. CBFC conditioned its offer to purchase a controlling interest on Capital Bank's ability to obtain a discount on repayment of TARP funds from the Treasury Department, and included the condition in written documents provided to Capital Bank shareholders and the Securities and Exchange Commission. Id. ¶¶ 36–37. However, CBFC's highest executive officers orally stated that CBFC would close the deal regardless of whether Capital Bank received a discount on its TARP payments. Id. ¶ 37. On November 19, 2010, Capital Bank sent its shareholders notice of CBFC's offer, including the TARP discount condition and the possibility that Yarber might become eligible for severance pay under the Employment Contract. Id. ¶¶ 39, 43–44. The notice also stated that several of Capital Bank's directors would receive hundreds of thousands of dollars in Supplemental Executive Retirement Plan ("SERP") payments if CBFC completed the purchase. Id. ¶ 48.

The Treasury Department refused to give Capital Bank a discount on the TARP payments. Id. ¶ 53. In response, CBFC threatened to withdraw its offer to purchase a controlling share of Capital Bank unless Yarber and other bank executives signed amendments to their employment agreements relinquishing their right to change-in-control severance payments. Id. ¶¶ 54, 56. CBFC did not require Capital Bank's directors to give up any SERP payments. Id. ¶ 57.

O.A. Keller, the chairman of Capital Bank's board of directors, told Yarber that he "had no option but to give up any payments due under his Employment Contract," and that the board of

3

directors could and would terminate Yarber for cause if he refused to give up his right to change-in-control severance payments. Id. ¶¶ 59–60. Keller also told Yarber that Capital Bank's shareholders could sue Yarber for breach of fiduciary duty if Yarber refused to amend his Employment Contract and his refusal caused CBFC to withdraw its offer. Id. ¶ 60. Yarber believed that he could not be fired for cause or sued, but was concerned that his reputation would be damaged if the board of directors terminated him, even for false reasons. Id. ¶¶ 61, 64. On January 14, 2011, Yarber signed an amendment (the "2011 Amendment") to his Employment Contract. Id. ¶ 65. The 2011 Amendment effectively eliminated Yarber's right to severance payments under the Employment Contract. Id. ¶ 66. The amendment also created a term of employment, with the employment term and contract both expiring on November 4, 2011. Id. ¶ 70; Pl.'s Mem. Opp. Mot. Dismiss [D.E. 15] 12.

On January 31, 2011, CBFC closed the deal to purchase a controlling share of Capital Bank. Id. ¶ 71. Thereafter, Yarber was removed from his position as president and chief executive officer, and was assigned to work as a commercial and retail manager. Id. ¶ 74. Later, Yarber became manager of retail operations in the Carolinas. Id. ¶ 75. Yarber continued his employment with Capital Bank until his termination on November 14, 2011. Id. ¶ 100. Yarber never received any change-in-control severance payments under the Employment Contract. Id. ¶ 109.

Yarber asserts six claims: (1) defendants violated ERISA by refusing to pay his change-in-control severance payments, and by terminating his employment upon false grounds with the intent of denying his right to severance benefits, id. ¶¶ 107–14; (2) defendants breached their fiduciary duty under ERISA, id. ¶¶ 115–20; (3) Yarber is entitled to declaratory relief stating that the Employment Contract is valid and in force, id. ¶¶ 121–30; (4) defendants wrongfully discharged Yarber with the purpose of interfering with his right to severance payments, id. ¶¶ 131–38; (5) defendants breached

4

Case 5:12-cv-00071-D Document 17 Filed 03/18/13 Page 4 of 17

the Employment Contract by refusing to pay Yarber his change-in-control severance payments, id. ¶¶ 139–147; and (6) CBFC tortiously interfered with the performance of the Employment Contract. Id. ¶¶ 148–60.

## II.

Initially the court considers whether the change-in-control severance pay provisions in the Employment Contract created an employee benefit plan governed by ERISA. See 29 U.S.C. § 1002(3). Claims related to an ERISA plan provide the only basis for federal jurisdiction in this case. See Compl. ¶ 3; 29 U.S.C. § 1132. The parties agree that the claims in this case involve an ERISA plan. Compl. ¶ 8; Defs.' Mem. Supp. Mot. Dismiss [D.E. 13] 9–10. However, a federal court independently must "assess its subject-matter jurisdiction." Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 480 (4th Cir. 2005). If the severance pay provisions are not an ERISA plan, this court lacks subject-matter jurisdiction.

The hallmark of an ERISA plan is that it "requires an ongoing administrative program to meet the employer's obligation." Fort Halifax Packing Co. v. Coyne, 482 U.S. 1, 11 (1987); Lomas v. Red Storm Entm't, Inc., 49 F. App'x 396, 400 (4th Cir. 2002) (per curiam) (unpublished); Mullaly v. Ins. Servs. Office, Inc., 395 F. Supp. 2d 290, 294 (M.D.N.C. 2005). Many courts have considered whether particular executive change-in-control severance provisions require an ongoing administrative program and qualify as ERISA plans. E.g., Lomas, 49 F. App'x at 400; Bowles v. Quantum Chem. Co., 266 F.3d 622, 630–33 (7th Cir. 2001); Emmenegger v. Bull Moose Tube Co., 197 F.3d 929, 934–35 (8th Cir. 1999); Rodowicz v. Mass. Mut. Life Ins. Co., 192 F.3d 162, 170–72 (1st Cir. 1999); Collins v. Ralston Purina Co., 147 F.3d 592, 595–97 (7th Cir. 1998); Kulinski v. Medtronic Bio-Medicus, Inc., 21 F.3d 254, 256–58 (8th Cir. 1994); Fontenot v. NL Indus., Inc., 953 F.2d 960, 962–63 (5th Cir. 1992); Caffrey v. Four Oaks Bank & Trust Co., No. 5:10-CV-341-FL,

5

2011 WL 2580674, at *4–6 (E.D.N.C. June 29, 2011) (unpublished); Fair v. Giant of Md. LLC, No. DKC2005-1306, 2006 WL 361338, at *5–9 (D. Md. Feb. 15, 2006) (unpublished); Mullaly, 395 F. Supp. 2d at 294–96. To evaluate whether severance pay provisions are ERISA plans, courts typically examine several factors, including

> (1) the amount of managerial discretion granted in paying the benefits and whether a case-by-case review of employees is needed; (2) whether payments are triggered by a single, unique event in the course of business or on a recurring basis; (3) whether the employer must make a one-time, lump-sum payment or continuous, periodic payments; and (4) whether the employer undertook any long-term obligations with respect to the payments.

Mullaly, 395 F. Supp. 2d at 295.

As for the first factor, the Employment Contract entitled Yarber to change-in-control severance payments if Capital Bank terminated his employment for any reason other than cause, disability, or death, during the period beginning ninety days before and up to three years after a change in control. See Employment Contract § 5(b)(i). Yarber also would qualify for the severance payments if he voluntarily terminated his employment for "Good Reason," which the contract defines as "a material adverse change [in] status, title, position, or responsibilities"; "the assignment ... of any duties or responsibilities which are materially inconsistent with his status, title, position[,] or responsibilities,"; "removal ... from or failure to reappoint ... him to any of such positions, status, or title" except for disability, cause, or death; a reduction in Yarber's base salary; a change in Yarber's work location of more than thirty miles; the failure of Capital Bank to continue any benefits in place at the time of the change in control without replacing those benefits with "substantially similar or greater benefits taken in the aggregate"; any material breach of the Employment Contract; or the failure of Capital Bank to obtain an agreement from any successor or assign of Capital Bank to perform under the contract. See Employment Contract § 5(b)(ii).

6

Determining whether Yarber was terminated for cause, or whether he voluntarily terminated due to a "material adverse change" in his employment status, the assignment of "materially inconsistent" duties, or the failure to provide "substantially similar or greater benefits taken in the aggregate" would require Capital Bank to exercise substantial discretion to determine his eligibility for severance pay. See Collins, 147 F.3d at 596–97; Caffrey, 2011 WL 2580674, at *5; Fair, 2006 WL 361338, at *8; Mullaly, 395 F. Supp. 2d at 295. Moreover, because Capital Bank had similar contracts with other employees, Compl. ¶ 56, Capital Bank would need to maintain records and create some administrative process to ensure that the bank determined severance pay eligibility in a fair and consistent manner. See Collins, 147 F.3d at 596. This factor weighs heavily in favor of finding an ERISA plan.

As for the second factor, the Employment Contract required the severance payments to be made upon the occurrence of a single event with respect to Yarber, which weighs against finding an ERISA plan. See, e.g., Fort Halifax, 482 U.S. at 12; Collins, 147 F.3d at 595. However, the existence of other employee contracts offering similar benefits would require Capital Bank to maintain some administrative scheme to consider employee eligibility on multiple occasions as the employment of each potential claimant was terminated. See Collins, 147 F.3d at 595–96; Caffrey, 2011 WL 2580674, at *6; Mullaly, 395 F. Supp. 2d at 296. This factor weighs slightly in favor of finding an ERISA plan.

As for the third and fourth factors, the Employment Contract provides severance payments to be made monthly for as long as three years. Employment Contract § 5(c)(i). Because the payment amounts are mathematically determined and are provided only for a limited time, these factors weigh against finding an ERISA plan. See, e.g., Mullaly, 395 F. Supp. 2d at 296.

After considering the factors, the court finds that the change-in-control severance pay

7

provisions in Yarber's Employment Contract would require an ongoing administrative program, and the severance pay provisions created an ERISA plan. Thus, the court has subject-matter jurisdiction.

III.

Yarber first claims that defendants violated ERISA section 502, 29 U.S.C. § 1132, by refusing to make change-in-control severance payments under the Employment Contract, and by terminating his employment with the intent of denying his rights to those benefits. Compl. ¶¶ 107–14. Defendants respond that Yarber's 2011 Amendment, which eliminated Yarber's right to severance payments, dooms this claim. See Defs.' Mem. Supp. Mot. Dismiss 9.

"A plan established by an employer providing for severance pay benefits is an employee welfare benefit plan covered by ERISA. However, because a welfare benefit plan is not subject to ERISA's vesting provisions, an employer is free to amend the terms of the plan or to terminate it entirely." Biggers v. Wittek Indus., Inc., 4 F.3d 291, 295 (4th Cir. 1993); see Sejman v. Warner-Lambert Co., 889 F.2d 1346, 1348–49 (4th Cir. 1989). Employee benefit plans under ERISA must be established by a written instrument and must include a procedure for amending the plan. 29 U.S.C. § 1102(a)(1), (b)(3); see Biggers, 4 F.3d at 295. "[A]ny modification to a plan must be implemented in conformity with the formal amendment procedures and must be in writing." Coleman v. Nationwide Life Ins. Co., 969 F.2d 54, 58–59 (4th Cir. 1992).

Yarber's Employment Contract provides that the change-in-control severance provisions can be modified if "such change or modification is in writing and signed by the parties." Employment Contract § 11. Yarber admits that he signed a written amendment to the Employment Contract that "effectively deleted the language allowing [him] to obtain his change in control severance payment." Compl. ¶¶ 65–66. Yarber does not allege that he signed the amendment under duress. Pl.'s Mem. Opp. Mot. Dismiss 16 n.6. Moreover, the complaint makes clear that Capital Bank followed the

8

amendment procedure set forth in the Employment Contract and the 2011 Amendment is effective. Thus, Yarber's first claim fails.

In opposition to this conclusion, Yarber argues that the 2011 Amendment is void for lack of consideration and that the unmodified Employment Contract was in effect when defendants terminated his employment. Pl.'s Mem. Opp. Mot. Dismiss 5. Defendants respond that ERISA preempts state contract law issues related to the amendment of an ERISA plan, and that (in any event) Yarber received consideration for the 2011 Amendment. Defs.' Mem. Supp. Mot. Dismiss 9–14.

Because ERISA allows employers to amend or eliminate employee welfare benefit plans, "[t]o the extent . . . that contract principles are implicated, they are entirely preempted by ERISA." O'Shea v. Commercial Credit Corp., 930 F.2d 358, 362 n.3 (4th Cir. 1991), superseded by statute on other grounds, 29 U.S.C. § 626(f). ERISA preemption precludes any argument that an otherwise valid plan amendment is void for lack of consideration. See id.; Tobin v. Ravenswood Aluminum Corp., 838 F. Supp. 262, 269–70 (S.D. W. Va. 1993). Thus, the court rejects Yarber's consideration argument.

Alternatively, Yarber argues that even if ERISA preempts state law, the terms of the Employment Contract require any amendment to comply with North Carolina contract law; therefore, failure of consideration voids the 2011 Amendment. See Pl.'s Mem. Opp. Mot. Dismiss 7. Under North Carolina law, an agreement to alter a contract must be supported by consideration. Brenner v. Little Red Sch. House, Ltd., 302 N.C. 207, 215, 274 S.E.2d 206, 212 (1981); Wheeler v. Wheeler, 299 N.C. 633, 637, 263 S.E.2d 763, 765 (1980). Consideration is "any benefit, right, or interest bestowed upon the promisor, or any forbearance, detriment, or loss undertaken by the promisee." Brenner, 302 N.C. at 215, 274 S.E.2d at 212; Sessler v. Marsh, 144 N.C. App. 623, 634,

9

551 S.E.2d 160, 167 (2001). Creation of a definite term of employment for an at-will employee is consideration that will support an amendment to an employment contract. See Hejl v. Hood, Hargett & Assocs., Inc., 196 N.C. App. 299, 304, 674 S.E.2d 425, 428 (1999); Amdar, Inc. v. Satterwhite, 37 N.C. App. 410, 414, 246 S.E.2d 165, 167 (1978). Among other benefits Yarber received by signing the 2011 Amendment, the 2011 Amendment created a term of employment for Yarber, who had formerly been an at-will employee. See Compl. ¶ 70; Employment Contract § 4(a).[1] In return, Yarber abandoned his right to severance benefits. See Compl. ¶¶ 60–65. This consideration suffices to uphold the 2011 Amendment. Cf. Chaplin v. NationsCredit Corp., 307 F.3d 368, 374–75 (5th Cir. 2002). Thus, assuming without deciding that the Employment Contract requires amendments to be supported by consideration, Yarber received consideration in exchange for surrendering his right to change-in-control severance pay, and the 2011 Amendment is valid.

As for Yarber's argument concerning his termination, the 2011 Amendment deleted the language granting Yarber eligibility for change-in-control severance payments, and created a term of employment ending on November 4, 2011. After November 4, 2011, Yarber became an at-will employee with no employment contract. See Compl. ¶¶ 66, 70. On November 14, 2011, defendants terminated Yarber's at-will employment. Id. ¶ 100.

Because the 2011 Amendment is enforceable and deleted the language allowing Yarber to obtain change-in-control severance payments, Yarber had no right to any change-in-control severance payments. Thus, defendants did not violate ERISA by refusing to give Yarber such

---

[1]Yarber contends that he was not an at-will employee under the Employment Contract before the 2011 Amendment because he would have been entitled to severance payments upon termination. Pl.'s Mem. Opp. Mot. Dismiss 13 n.5. The availability of severance pay, however, does not alter an employee's at-will status. See Myers v. Town of Plymouth, 135 N.C. App. 707, 710, 522 S.E.2d 122, 124 (1999); see also Kurtzman v. Applied Analytical Indus., Inc., 347 N.C. 329, 331, 493 S.E.2d 420, 422 (1997) ("[I]n the absence of a contractual agreement . . . establishing a definite term of employment, the relationship is presumed to be terminable at the will of either party . . . .").

payments when they terminated his at-will employment on November 14, 2011. Furthermore, because Yarber was not entitled to change-in-control severance payments when defendants terminated his employment, defendants could not have violated ERISA by terminating Yarber with the intent to deny him those benefits. Accordingly, Yarber's first claim fails to state a claim upon which relief can be granted and the claim is dismissed.

Yarber's second claim alleges that defendants violated their duties as ERISA fiduciaries by acting in their own interests, by misrepresenting that Yarber would receive change-in-control severance benefits, and by threatening to discharge Yarber and mentioning possible shareholder lawsuits against Yarber if he did not give up the severance benefits. See Compl. ¶ 118. Defendants respond that the claim fails because they were not acting as ERISA fiduciaries when they allegedly took those actions.

"[E]mployers or other plan sponsors are generally free under ERISA, for any reason at any time, to adopt, modify, or terminate welfare plans. . . . When employers undertake those actions, they do not act as fiduciaries . . . ." Lockheed Corp. v. Spink, 517 U.S. 882, 890 (1996) (quotation and citations omitted); see Finley v. Hoechst Celanese Corp., 941 F.2d 1206, 1991 WL 159716, at *4 (4th Cir. 1991) (per curiam) (unpublished table decision); Sutton v. Weirton Steel Div. of Nat'l Steel Corp., 724 F.2d 406, 410–11 (4th Cir. 1983). ERISA requires employers to manage welfare benefits plans as fiduciaries but allows employers to continue making sound business decisions with respect to providing those plans. See Sejman, 889 F.2d at 1349; Dzinglski v. Weirton Steel Corp., 875 F.2d 1075, 1079 (4th Cir. 1989) ("Business decisions can still be made for business reasons, notwithstanding their collateral effect on prospective, contingent employee benefits."); Young v. Standard Oil (Indiana), 849 F.2d 1039, 1045 (7th Cir. 1988). In particular, employers who provide ERISA plans maintain the right "to renegotiate or amend . . . unfunded contingent benefits payable

11

before normal retirement age." Sutton, 724 F.2d at 411. Renegotiations of welfare benefit plans "are not to be reviewed by fiduciary standards." Id.

When defendants negotiated with Yarber and persuaded him to surrender his severance benefits, they were not acting as ERISA fiduciaries and did not violate any fiduciary duty. As stated in the complaint, defendants' alleged threats—that Yarber would be fired for cause or might be sued by shareholders if he did not sign the amendment—were false threats that made Yarber choose between his reputation and continued employment, on the one hand, and his severance benefits on the other. Compl. ¶¶ 60–61, 64–65; see Pl.'s Mem. Opp. Mot. Dismiss 14 ("If no Amendment existed Defendants would have had to . . . terminate [Yarber] . . . and incur[] a severance obligation . . . ."). Yarber, the president and chief executive officer of a corporation worth over $1.8 billion dollars, made a calculated decision to give up his right to severance payments, but to retain his reputation and change his employment status from an at-will employee to an employee with a definite term of employment. See Compl. ¶¶ 27, 64–65.[2] That Yarber had to make a difficult but voluntary decision about his severance benefits in the course of closing a $180 million transaction does not give rise to ERISA liability. See Sutton, 724 F.2d at 411.

As for the alleged misrepresentations, "[l]ying is inconsistent with the duty of loyalty owed by all fiduciaries and codified in section 404(a)(1) of ERISA." Varity Corp. v. Howe, 516 U.S. 489, 506 (1996) (alteration in original) (quotation omitted); see Griggs v. E.I. DuPont de Nemours & Co.,

---

[2] Yarber also received other benefits due to signing the 2011 Amendment and helping to ensure the closing of CBFC's $180 million investment. First, when the deal closed, as a shareholder with over 28,000 shares of Capital Bank's common stock [D.E. 13-1] 14, the value of Yarber's common stock increased. Second, when the deal closed, Yarber received contingent value rights ("CVR") that entitled him to receive up to $.075 in cash per CVR at the end of the five-year period after closing. See [D.E. 13-1]; [D.E. 13-6] 3. Third, when the deal closed, Yarber received a change in control payment of $830,014 under Capital Bank's Supplemental Executive Retirement Plan. See [D.E. 13-7] 4.

237 F.3d 371, 380 (4th Cir. 2001). "[A] fiduciary must give complete and accurate information to a beneficiary if the beneficiary requests information . . . [and] a fiduciary must provide material facts affecting the interest of the beneficiary which he knows the beneficiary does not know and which the beneficiary needs to know for his protection." Phelps v. CT Enters., 194 F. App'x 120, 126 (4th Cir. 2006) (per curiam) (unpublished) (quotations and citation omitted). However, "ERISA does not impose a duty of clairvoyance on fiduciaries. . . . An ERISA fiduciary is under no obligation to offer precise predictions about future changes to its plan." Fischer v. Phila. Elec. Co., 994 F.2d 130, 135 (3d Cir. 1993) (citation and quotation omitted); see Berlin v. Mich. Bell Tel. Co., 858 F.2d 1154, 1164 (6th Cir. 1988).

Yarber alleges that defendants "misrepresent[ed] to plaintiff their intent to pay him the benefits to which he was entitled after a change of control if he would support the CBFC investment bid." Compl. ¶ 118. However, even viewing the complaint in the light most favorable to Yarber, Yarber pleads other facts that eviscerate this allegation. When any statements regarding Yarber's continued eligibility for severance payments were made before he signed the 2011 Amendment, Yarber's Employment Contract obligated defendants to pay him change-in-control benefits, and the contract bound any successor of Capital Bank. See Compl. ¶ 29; Employment Contract §13. In the process leading to the change in control, defendants notified shareholders that Yarber would be eligible for severance payments if he were terminated within twelve months of the change in control. Compl. ¶ 44. Statements that Yarber would continue to be eligible for severance payments were true and accurate until Yarber knowingly and voluntarily signed the 2011 Amendment. The complaint alleges that the intent to make Yarber surrender his right to change-in-control payments arose after the Treasury Department refused to give CBFC a discount on repayment of TARP funds. Id. ¶¶ 54–56. Yarber, however, has not plausibly alleged that defendants' intention to seek to avoid his

13

right to severance payments existed before defendants learned about the Treasury Department's adverse decision. Thus, the complaint does not suggest that defendants made any untrue or misleading representations regarding Yarber's benefits, his eligibility for benefits, or defendants' intent to provide any benefits. Instead, the complaint merely recites changed circumstances after the Treasury Department's adverse decision. When defendants stated that Yarber would maintain his right to change-in-control severance payments, they were not required to predict that the Treasury Department would refuse to discount the bank's TARP repayments, or that CBFC would respond by demanding that Yarber (and other executives) surrender the right to severance payments. See Fischer, 994 F.2d at 135; Berlin, 858 F.2d at 1164.

Because defendants were not acting as ERISA fiduciaries when they renegotiated the terms of the Employment Contract, and because they made no misrepresentation with respect to Yarber's eligibility for plan benefits, Yarber's second claim fails. Accordingly, Yarber's second claim is dismissed.

Yarber's third claim seeks declaratory relief stating that the Employment Contract remained valid and was in force when defendants terminated his employment, and that defendants breached their duties as ERISA fiduciaries. Compl. ¶¶ 121–30. However, as already explained, the Employment Contract was not in force when Yarber was discharged and defendants did not breach any of their duties as ERISA fiduciaries. Hence, Yarber's third claim is dismissed.

Yarber's fourth claim alleges that defendants wrongfully discharged him "with the purpose of interfering with his attainment of . . . his change of control severance payments" in violation of ERISA Section 510, 29 U.S.C. § 1140. Compl. ¶¶ 132–33.[3] However, Yarber signed the 2011

---

[3] In the complaint, this claim is titled "Fourth Claim for Relief: Wrongful Discharge in Interference with ERISA Rights," and includes no facts that plausibly state a claim for discrimination. See Compl. ¶¶ 131–38. In his response memorandum, Yarber suggests for the first

14

Amendment, which created a term of employment ending on November 4, 2011. Compl. ¶¶ 65, 70. After November 4, 2011, Yarber was an at-will employee with no employment contract. See id. Defendants terminated Yarber's employment on November 14, 2011, ten days after his contract had expired. Compl. ¶ 100. Therefore, when defendants discharged Yarber, Yarber had no employment contract and was not entitled to change-in-control severance payments. Thus, defendants could not have acted with intent to deprive him of any severance payments. Accordingly, Yarber's fourth claim fails to state a claim upon which relief can be granted, and the claim is dismissed.

Yarber's fifth claim alleges state-law breach of contract because defendants refused to make the severance payments owed to Yarber under the Employment Contract. Compl. ¶¶ 139-47. As Yarber concedes, however, ERISA preempts this claim and converts it into an ERISA claim under section 502. See 29 U.S.C. §§ 1132(a), 1144(a); Metro. Life Ins. Co. v. Taylor, 481 U.S. 58, 62-63 (1987); Darcangelo v. Verizon Commc'ns, Inc., 292 F.3d 181, 194-95 (4th Cir. 2002); Holland v. Burlington Indus., Inc., 772 F.2d 1140, 1147 (4th Cir. 1985), aff'd sub nom. Brooks v. Burlington Indus., Inc., 477 U.S. 901 (1986), abrogated on other grounds by Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101 (1989). Thus, Yarber's fifth claim merely restates his first claim and meets the same fate. Accordingly, Yarber's fifth claim is dismissed.

Finally, Yarber's sixth claim alleges tortious interference with contract by CBFC for "wrongfully induc[ing]" the directors of Capital Bank to threaten plaintiff unless he relinquished his rights to severance payments. Compl. ¶¶ 148-60. Defendants respond that ERISA also preempts this claim.

time that his fourth claim also includes an allegation of discrimination. Pl.'s Mem. Opp. Mot. Dismiss 23. Yarber, however, has not properly pleaded a claim for discrimination in count four, and the court does not consider it here.

ERISA preempts Yarber's claim for tortious interference with contract. See Epling v. Dolgencorp, Inc., No. 3:05-1196, 2006 WL 925171, at *2 (S.D. W. Va. Apr. 10, 2006) (unpublished); Smith v. Logan, 363 F. Supp. 2d 804, 812 (E.D. Va. 2004); Colleton Reg'l Hosp. v. MRS Med. Review Sys., Inc., 866 F. Supp. 891, 895 (D.S.C. 1994); see also Pelosi v. Schwab Capital Mkts., L.P, 462 F. Supp. 2d 503, 515–18 (S.D.N.Y. 2006); Somoano v. Ryder Sys., Inc., 6 F. Supp. 2d 1342, 1346 (S.D. Fla. 1998). However, "ERISA pre-emption, without more, does not convert a state claim into an action arising under federal law." Taylor, 481 U.S. at 64; see Darcangelo, 292 F.3d at 187. To be converted into a federal claim, the state-law claim must "fit within the scope of ERISA's [section] 502 civil enforcement provision." Darcangelo, 292 F.3d at 187; see Termini v. Life Ins. Co. of N. Am., 464 F. Supp. 2d 508, 515–16 (E.D. Va. 2006). Yarber argues that the tortious interference claim can be converted into a claim to enforce his rights under ERISA section 510.

Section 510 makes it "unlawful for any person to . . . discriminate against a participant or beneficiary . . . for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. The complaint alleges that CBFC wrongfully induced directors of Capital Bank to threaten plaintiff in order to force him to relinquish his right to severance payments. Compl. ¶¶ 151–54. Yarber appears to argue that CBFC's actions constitute "discrimination" under section 510.

Yarber has failed to plausibly allege discrimination prohibited by section 510. To say CBFC induced a negotiated reduction in ERISA plan benefits to prevent Yarber from obtaining those benefits "is a tautology which highlights the fact that this sort of allegation cannot support a [section] 510 claim." Deeming v. Am. Standard, Inc., 905 F.2d 1124, 1127 (7th Cir. 1990). Instead, "[s]ection 510 is relevant where there is an allegation that 'an employer-employee relationship, and

16

not merely the [benefits] plan, was changed in some discriminatory or wrongful way.'" Riley v. Murdock, 890 F. Supp. 444, 454 (E.D.N.C. 1995) (quoting Deeming, 905 F.2d at 1127); see Stiltner v. Beretta U.S.A. Corp., 74 F.3d 1473, 1484 (4th Cir. 1996) (en banc) ("[C]ourts have limited 'discriminate against' . . . to actions affecting the employer-employee relationship. . . . [W]e are not inclined to ascribe a second meaning."). Capital Bank retained the right, at any time, to seek to renegotiate the terms of Yarber's severance provisions. See Sutton, 724 F.2d at 411. CBFC did not alter Yarber's employment relationship by inducing Capital Bank to negotiate with Yarber in order to convince him to surrender his right to severance payments. Furthermore, CBFC sought to change not just Yarber's severance-benefit eligibility, but that of many bank executives. Compl. ¶ 56. When a benefit-plan alteration is aimed at a plan generally, and not at an individual, there is no cause of action under section 510. See McGann v. H&H Music Co., 946 F.2d 401, 405–07 (5th Cir. 1991); Duncan v. State Farm Ins. Cos., 896 F. Supp. 543, 547 (D.S.C. 1995). Thus, Yarber's claim for tortious interference with contract fails to state a claim for discrimination under ERISA section 510. Accordingly, Yarber's sixth claim is dismissed.

IV.

In sum, the court GRANTS defendants' motion to dismiss [D.E. 12] for failure to state a claim upon which relief can be granted.

SO ORDERED. This **18** day of March 2013.

JAMES C. DEVER III
Chief United States District Judge

17